FILED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 MAR 29 PM 1:53

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JAMES PATTON, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. CV 96-B-2661-S |
| | } | |
| BIRMINGHAM BUDWEISER | } | |
| DISTRIBUTING CO., INC., | } | |
| | } | |
| Defendant. | } | |

ENTERED

MAR 29 1999

## MEMORANDUM OPINION

Currently before the court is the Motion filed by defendant Birmingham Budweiser Distributing Co., Inc., (hereinafter "BBD" or "the Company") for Summary Judgment. Defendant seeks summary judgment on plaintiff's claims that he was terminated by the defendant on the basis of his race and in retaliation for having filed an EEOC charge in violation of 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000, *et seq.* Upon consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted.

### I. FACTUAL SUMMARY

BBD is a wholesale beer distributer which sells and distributes Anheuser-Busch beer to retailers located in Birmingham, Alabama, and the surrounding areas. (DX 1 ¶ 3).[1] Suppliers

---

[1] Defendant's evidentiary submissions will be referenced as DX followed by the exhibit number. Plaintiff's evidentiary submissions will be referenced as PX followed by the exhibit number.

1

deliver beer to the Company's warehouse where the beer is stored. (*Id.*). The beer is then loaded onto BBD trucks and delivered to the customers of BBD. (*Id.*).

The BBD warehouse has three shifts, each supervised by a warehouse manager. (DX 2 ¶ 3). The day-shift manager works from approximately 7:00 a.m. to 5:00 p.m. (*Id.*). The day-shift manager's main duties include receiving and rotating beer, and pulling orders going to grocery stores. (DX 5 at 13). The mid-shift manager works from approximately 11:00 a.m. to 9:00 p.m. (DX 2 ¶ 3). The duties of the mid-shift manager include beginning the bulk operations, and staging beer to be loaded that night for the next day's delivery. (DX 6 at 33). The night-shift manager works from 4:00 p.m. to 1:00 a.m. (DX 2 ¶ 3). The night shift manager's responsibilities include cleaning the warehouse so operations can begin again the next day, counting the trucks after they are loaded at night, organizing crews, and gathering paperwork on each truck. (DX 6 at 25, 28, 33)

Plaintiff began working for BBD in May 1991, as a warehouse laborer in the night loader position. (DX 9). From 1992 through June of 1994, Chris Willis served as Director of Operations for the warehouse at BBD. (DX 2 ¶ 2). Willis was responsible for the overall operations of the warehouse and supervised the plaintiff. (*Id.*). In June of 1994, Bob Stump became Director of Operations. (DX 3 ¶ 2). As the person responsible for the overall operations of the warehouse, plaintiff was one of the warehouse supervisors under Stump's supervision during his tenure as Director of Operations. (*Id.*). The Company's Vice-President during plaintiff's entire employment with BBD was Pat Lynch. (DX 1 ¶ 2).

Plaintiff was promoted to the position of night-shift warehouse manager in May of 1992. (DX 10). Plaintiff expressed an interest to Chris Willis in moving to the mid-shift, and in September of 1993, when a position became available, he was moved to the mid-shift manager

2

position. (DX 6 at 23, 51, 53).

When plaintiff was moved to the mid-shift manager position he was replaced as night-shift manager by Claude Alesce (a white male). (DX 6 at 17-18). Alesce did not work out in that position. (*Id.*). At some point Ken Johnson, an African-American, became manager of the night-shift. (DX 7 at 20-21, 27-18). Johnson was also removed from the position. (*Id.* at 27). At some point after Mr. Johnson was removed from the night-shift position, plaintiff was returned to the position of manager of the night-shift. (*Id.* at 29).

After plaintiff was moved back to night-shift manager, Susan Patterson was put in as mid-shift manager. (Pl.'s Dep. at 220-223). Patterson had previously been Inventory clerk. (Patterson Dep. at 12). Patterson and plaintiff approached Stump, the Director of Operations, about cross-training in November of 1994. (*Id.* at 14). During the cross-training, Patterson trained the plaintiff in inventory. (*Id.* at 17). After a few months, the cross-training was called off due to problems resulting from the swap. (Stump Dep. at 39). Stump stated that the problems included inventory reconciliation being out of line on the mid-shift. (*Id.*). Stump put Patterson back on the mid-shift and plaintiff back on the night-shift due to the fact that he felt that the abilities of the two managers best served the company in those respective time slots. (*Id.* at 41). Plaintiff remained night-shift manager until his termination on July 13, 1995. (DX 21).

On May 18, 1994, plaintiff received a written reprimand from Chris Willis for failure to follow security procedures. (DX 13). This reprimand stated that plaintiff failed to properly secure the facility before leaving for the night. (*Id.*). Specifically, the reprimand stated that plaintiff left the overhead door leading from the draft cooler to the back door open all night. (*Id.*). Plaintiff signed this reprimand. (*Id.*).

On August 1, 1994, Bob Stump issued plaintiff a written warning for his failure to

3

properly verify loads. (DX 15). The warning stated that plaintiff did not properly verify loads and stated that "while checking trucks before they leave [sic] Monday morning we found several trucks miscounted." (Id.). Plaintiff protested this warning, and requested a meeting with Lynch. (Id.). Stump testified that fifteen trucks had not been counted at all . (DX 7 at 58-59).

On November 30, 1994, plaintiff was issued another written warning for not properly securing the property before he left for the night. (DX 16). Bob Stump wrote that the gate was not locked and that one side of the gate was open when Stump arrived for work. (Id.). The statement said that "[s]ecurity is the one most important responsibility of the night supervisor." (Id.).

On December 15, 1994, plaintiff received a warning for not telling an employee to wear a hard hat. The warning stated: "As a supervisor James should have told Tommy Fuller to wear hard hat." (DX 18).

On June 26, 1995, plaintiff was issued a warning for failure to complete his job duties. (DX 20). This warning stated that on June 22, 1995, product was damaged and scattered through the warehouse. It also noted that there was a parked truck blocking the driver parking area, and mixed pallets taken off trucks were not stacked back into stock. (Id.). Plaintiff refused to sign this warning. (Id.).

In May of 1994, plaintiff complained to Lynch, Willis and Stump about not receiving a raise. (Pl.'s Exh. 13). A memo in plaintiff's personnel file signed by Bob Stump states:

> For the past three weeks[2] Mr. Patton has voiced an unhappy attitude about his lack of a raise. He has, since I have been employed here, been reprimanded for not completing his job assignments.
>
> It was explained why he was not given a raise, but, through verbal complaints to Chris Willis and myself and physical actions in his work it was evident he was unhappy with his work situation.
>
> On Thursday I informed him he would have to wait until next week for a meeting with Mr. Lynch. The following day, Friday, he called in sick and expressed his dis-satisfaction to Chris Willis about his salary. Mr. Patton said it was not fair that Glenn Henze was given a raise and he did not receive one.
>
> After discussing the situation with Mr. Lynch James was given a $1,500.00 a year raise. Upon being told of his raise he said it was not enough, that he had expected to be brought up to Glenn's salary. Mr. Lynch said that he could either keep the raise or leave.

(PX 13). Lynch testified that when plaintiff discussed his concerns about not receiving a raise, plaintiff did not mention race or any belief that he was being discriminated against on the basis of his race. (DX 1 ¶ 4). Plaintiff testified that when he discussed raises with Lynch he told him he felt like he had "been discriminated against." (PX 1 at 236).[3] It is unclear from plaintiff's testimony when he contends his conversation with Lynch took place. Based on the other evidence, it appears the time frame must have been in the April-June 1994, time frame.

On June 29, 1995, plaintiff filed an EEOC charge alleging discrimination on the basis of race and sex. (PX 8). On July 13, 1995, Stump and Lynch met with the plaintiff regarding the

---

[2] Because this exhibit is dated May 1994, it is unclear whether the three week time-frame referenced in the memo refers to April or May of 1994.

[3] Drawing all inferences in favor of the non-movant as required for purposes of summary judgment, the court will assume that plaintiff's version of his conversation with Lynch is correct.

incident on June 22, 1995, that had resulted in a written warning.[4] (Lynch Dep. at 69-72). Plaintiff denied any responsibility for the condition of the warehouse. (*Id.* at 70, 159). Lynch testified that he discussed the possibility of plaintiff going to the sales department, and that he had discussed this with plaintiff in prior meetings. (*Id.* at 69, 72; DX 3 ¶ 6). At the July 13, 1995, meeting plaintiff stated that he never expressed an interest in sales and called Lynch a "liar." (DX 3 ¶ 6). Plaintiff was terminated on July 13, 1995, during this meeting with Lynch. He was replaced in the night-shift manager position by a white male. (DX 1 at 6). He had five written disciplinaries in his personnel file at the time of his termination. (DX 13, 15, 16, 18, 20).

Mr. Lynch testified that before the July 13, 1995, meeting in which plaintiff was terminated, he had a conversation with Bob Stump about terminating the plaintiff. (PX 5 at 65-66). Lynch testified that he (Lynch) had not made up his mind about whether to terminate the plaintiff until he met with the plaintiff. (*Id.*) Lynch testified that plaintiff was terminated primarily due to security issues and for not keeping the warehouse neat and clean. (*Id.* at 67). Lynch and Stump both testified that plaintiff was not interested in moving to a sales position. (*Id.* at 69, DX 3 at ¶ 6).

Pat Lynch and Bob Stump were the decision-makers with respect to plaintiff's termination. (DX 1 ¶ 7, DX 3 ¶ 7). Both Lynch and Stump testified they had no knowledge when plaintiff was terminated on July 13, 1995, that he had filed an EEOC charge on June 29, 1995. (*Id.*). Stump also testified that he was unaware that plaintiff had complained to Lynch in 1994 that he was denied a pay raise because of his race. (DX 3 ¶ 4).

---

[4] As noted above, plaintiff was issued a warning on June 26, 1995, for failure to complete his job duties. (*See* DX 20).

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

**Plaintiff's Amended Complaint**

Rule 8(a) of the Federal Rules of Civil Procedure provides:

> "[a] pleading which sets forth a claim for relief . . . shall contain
> (1) a short and plain statement of the grounds upon which the
> court's jurisdiction depends, unless the court already has

7

>jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks."

It is questionable whether plaintiff's Amended Complaint provides sufficient allegations to establish that plaintiff is entitled to relief on his claims that he was terminated in violation of Title VII and Section 1981 on the basis of his race and in retaliation for having filed an EEOC charge. (*See* Am. Compl. ¶ 7-11). The Amended Complaint also contains the following conclusory allegations:

>The defendants have engaged in unlawful and retaliating discriminatory practices against the plaintiff with regard to discharge, job assignments, promotions, discipline, training and other terms, conditions and privileges of employment.

Am. Compl. ¶ 6.

The Amended Complaint does not contain "a short and plain statement" of any claim relating to "job assignments, promotions, discipline, training [or] other terms, conditions and privileges of employment" which would show that the plaintiff "is entitled to relief" on any such claim. Paragraph 8 of the Amended Complaint states: "On or about June 1995, plaintiff complained to the defendants about not receiving **the promotion** due to the fact he was african-american. Further, plaintiff complained about Bob Stump, Operations Manager, giving plaintiff a written **discipline** on or about June 22, 1995." (Emphasis added). Although paragraph 8 does reference a promotion and a discipline, no facts are alleged in the Amended Complaint that would show plaintiff was entitled to any relief on a Title VII or Section 1981 race claim with

8

regard to discipline or promotions.[5]

Oral argument on defendant's Summary Judgment Motion helped somewhat to define and narrow the plaintiff's claims. Apparently, plaintiff is alleging that he was terminated by the defendant on the basis of his race and in retaliation for having filed an EEOC charge in violation of Title VII and 42 U.S.C. § 1981. Therefore, the court will not address any claim that plaintiff was denied a promotion or was subjected to discipline on the basis of his race.[6]

The court's analysis is governed by the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).[7] Under this framework, the plaintiff bears

---

[5] Although the first sentence of paragraph 8 references "**the promotion**," none of the paragraphs in the Amended Complaint describe any promotion sought by the plaintiff. In his brief in opposition to defendant's Motion for Summary Judgment plaintiff argues that the change in his shift from the mid-shift to the night-shift was discriminatory. (Pl.'s Br. in Opp'n to Def. M. Summ. J. at 28-29). This claim could only be brought under Section 1981 because the change in shifts did not occur within 180 days of the filing of plaintiff's EEOC charge. It is unclear from the evidence whether this claim would even be timely under the two year statute of limitations applicable to claims brought under Section 1981. According to plaintiff's own brief, plaintiff "was reassigned to the night shift on approximately May 16, 1994." (Pl.'s Br. in Opp'n to Def. M. Summ. J. at 3). The evidence cited by plaintiff for this statement does not reflect the date alleged by plaintiff. The evidence cited does not cite any date that plaintiff was reassigned to the night shift. If plaintiff is correct in his date of May 16, 1994, then this claim is also untimely under Section 1981 because plaintiff's complaint was not filed until October 10, 1996. At oral argument on defendant's Motion for Summary Judgment plaintiff's counsel did not pursue this claim. Even if this claim could be pursued under Section 1981, plaintiff failed to establish a prima facie case of discrimination with regard to job assignment.

[6] Because plaintiff's termination claim does require a discussion of plaintiff's prior discipline, the court will discuss plaintiff's discipline as it affected defendant's decision to terminate him.

[7] Although the statutory language and remedies of 42 U.S.C. § 1981 are distinct from Title VII, the allocation of the burdens of proof and the analysis for determining whether a defendant employer unlawfully discriminated against an employee are the same. *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994).

the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53. If plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If defendant succeeds in carrying this burden, then plaintiff must prove that the defendant's articulated reasons are a mere pretext for unlawful motives, in this case, race discrimination or retaliation. *Burdine*, 450 U.S. at 253. A plaintiff's prima facie case coupled with sufficient evidence to allow a factfinder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997). At all times, plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

**Plaintiff's claim that he was terminated on the basis of his race.**

To establish a prima facie case of race discrimination in termination plaintiff must prove that (1) he is a member of a protected class; (2) he was qualified for the position that he held; (3) he experienced an adverse employment action; and (4) he was replaced by someone outside the protected group. *Wilson v. AAA Plumbing Pottery Corp.*, 34 F.3d 1024, 1027 (11th Cir. 1994). This framework is meant to be flexible and may be applied to a wide variety of factual circumstances. As will be discussed below, assuming plaintiff has met his burden of establishing a prima facie case under this framework, he has not put forth sufficient evidence on which a reasonable jury could conclude that defendant's articulated reasons for his termination were a pretext for illegal discrimination on the basis of plaintiff's race.

Defendants have offered evidence that plaintiff was terminated due to security issues and for not keeping the warehouse neat and clean. At the time of his termination, he had five written

reprimands or warnings in his personnel file.

As pretext, plaintiff argues that the prior warnings or reprimands that he received were unwarranted. The warnings or reprimands were issued at different times by different supervisors. Plaintiff's belief that the reprimands were unjustified does not establish pretext on the part of Lynch and Stump in relying in part on the prior warnings and reprimands in plaintiff's personnel file in deciding whether to terminate the plaintiff.

In his brief in opposition to defendant's Motion for Summary Judgment, plaintiff did not argue that any person outside the protected class had engaged in conduct similar to the plaintiff and had not been terminated. However, in oral argument, plaintiff's counsel argued that Bob Stump should be used as a comparator to the plaintiff. Counsel argued that Stump had received similar written reprimands, but was not terminated. According to plaintiff's counsel, because Stump had engaged in similar misconduct to plaintiff and was not terminated, defendant's reasons for plaintiff's termination were a pretext for discrimination. Plaintiff's allegation that Stump had similar warnings or reprimands to plaintiff is not supported by the evidence submitted to the court. Plaintiff only produced one written violation, and one memo,[8] from the personnel file of Stump. (Pl.'s Supp. Exh. A and B). The memo is dated in 1994. There is no indication of when the written warning occurred. The written warning for Stump was similar to one of the violations received by the plaintiff, as both involved the inventory procedures of delivery vehicles. (*Id.*; DX 15). As noted, at the time of plaintiff's termination , he had five written reprimands in his personnel file in slightly more than a one-year period. Thus, Stump cannot be offered as a person outside the protected class who engaged in similar conduct to plaintiff and

---

[8] The memo is not critical of Stump and is not a warning or reprimand.

11

was not terminated. Because plaintiff has not put forth sufficient evidence on which a reasonable jury could conclude that defendant's articulated reasons for plaintiff's termination were pretext for illegal race discrimination, defendant is entitled to judgment as a matter of law on plaintiff's claim that he was terminated on the basis of his race.

**Plaintiff's claim that he was terminated in retaliation for having engaged in protected activity.**

In order to establish a prima facie case of retaliation under Title VII or Section 1981, a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) adverse employment action; and (3) a causal connection between the protected opposition and the termination. *Goldsmith v. City of Atmore,* 998 F.2d 1155, 1163 (11th Cir. 1993).

Once plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action. *Id.* At the summary judgment stage if the defendant proffers legitimate reasons, the burden then shifts back to the plaintiff to raise a genuine factual issue as to whether the defendant's proffered reason is a pretextual ruse to mask a retaliatory action. *Id.*

Plaintiff did engage in statutorily protected expression when he complained to Lynch in 1994 that he did not receive a raise due to discrimination and further when he filed the charge with the EEOC against BBD. *Holifield v. Reno,* 115 F.3d 1555, 1566 (11th Cir. 1997)( voicing concerns about racial discrimination to superiors is considered protected expression under Section 704(a)). Plaintiff is also able to prove that he was terminated, therefore satisfying the second element of the test. The only question that remains, with regard to the prima facie case, is whether plaintiff can establish a causal connection between his termination and one of his statutorily protected expressions of opposition to discrimination.

12

Viewing the evidence in the light most favorable to plaintiff, the court finds that plaintiff has not established a causal connection between his complaint to Lynch in May of 1994, that he did not receive a raise due to his race, and his termination in July of 1995. "In order to establish the requisite "causal link" required as part of a prima facie case, a plaintiff need only establish that "the protected activity and the adverse action were not wholly unrelated." *Goldsmith v. City of Atmore*, 996 F.2d at 1163. However, where a substantial period of time has elapsed between the filing of the EEOC charge and the adverse employment action, a causal connection is less likely to exist and a plaintiff must produce some evidence demonstrating a connection between the two events. Here, there is insufficient evidence on which a reasonable jury could find a causal connection between plaintiff's alleged complaint to Lynch in mid-1994 that he had been discriminated against on the basis of his race and his termination in July of 1995. *See Balleti v. Sun -Sentinel Co.*, 909 F. Supp 1539, 1549 (S.D. Fla 1995)(elapse of six months between grievance and discharge did not permit inference of causal connection); *Juarez v. Ameritech Mobile Communications, Inc.*, 746 F.Supp 798, 804 (N.D. Ill. 1990)(six months between complaint and termination too remote), *aff'd* 957 F.2d 317 (7th Cir. 1992); *Maldonado v. Metra*, 743 F. Supp 563, 568 (N.D. Ill 1990)(five months lapse between protected expression and termination too remote); *Reeves v. Digital Equipment Corp.*, 710 F.Supp 675, 677 (N.D. Ohio 1989)(no retaliation where three months passed between protected expression and adverse employment action). Thus, plaintiff has not established a prima facie case of retaliation with regard to his claim that defendant retaliated against him in 1995 for having engaged in protected conduct in mid-1994.

Plaintiff has also failed to establish a prima facie case with regard to his claim that he was terminated for filing a EEOC charge on July 14, 1995. In order to establish a prima facie case,

"[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Goldsmith*, 996 F.2d at 1163. "The defendant's awareness of the protected statement, however, may be proven by circumstantial evidence." *Id.* The decision makers with regard to plaintiff's termination, Stump and Lynch, both testified that they were unaware of plaintiff's EEOC charge at the time he was terminated. Plaintiff argues that the defendant should have received the Notice of the charge before plaintiff was fired due to procedures required under 42 U.S.C. § 2000e5(e)(1).[9] Plaintiff argues that two subsequent EEOC charges filed by plaintiff against the defendant were received by the defendant within ten days of plaintiff's filing, and therefore, the court should infer that plaintiff's June 29, 1995, charge would have been received by defendant within 10 days. (Pl.'s Supplemental Information Brief at 3). Although plaintiff argues that defendant received the July 14, 1995, and September 25, 1995, EEOC charges within ten days of the filing of the charges, there is no evidence before the court that defendant actually received them during this time period.

Defendant notes that the tenth day after plaintiff filed his complaint with the EEOC was Sunday, July 9, 1995. (Def. Resp. to Pl.'s Reply Supp. Info. at 1). Therefore, the EEOC might not have mailed the Notice until Monday, July 10, 1995. Thus, it is also reasonable to conclude that defendant did not receive the Notice until after the plaintiff had already been terminated on Thursday, July 13, 1995.

---

[9] 42 U.S.C. §2000e5(e)(1) states: "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and **notice of the charge (including the date, place, and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter** . . . ."(emphasis added).

14

As noted, the supervisors responsible for plaintiff's termination testified that they did not receive notice of plaintiff's EEOC charge before he was terminated. (DX 1 ¶ 7, DX 3 ¶7). A reasonable jury could not infer receipt of the Notice based solely upon plaintiff's calculations of the theoretical date of delivery. Nor could a reasonable jury infer that even if the Notice was properly sent to defendant BBD, that Lynch and Stump were made aware of the charge. Because plaintiff has not shown that the decision-makers with regard to his termination had knowledge of his protected activity, he has failed to establish a prima facie case that he was discharged in retaliation for having filed an EEOC charge.

## IV. CONCLUSION

After a careful review of all the evidence the court concludes that no genuine issues of material fact exist herein and defendant is entitled to judgment as a matter of law on all claims asserted by the plaintiff. An Order granting defendant's Motion for Summary Judgment will be entered contemporaneously with this Opinion.

**DONE** this 29th day of March, 1999.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
United States District Judge